Hines *v.* Fanti, Appellant.

Argued June 1, 1953.   Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ. Appeal, No. 167,

*E. C. Marianelli,* with him *Gomer W. Morgan,* for appellants.

*Max Rosenn,* with him *Harold Rosenn* and *Rosenn & Rosenn,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 26, 1953 :
On April 26, 1951, Howard Hines, a driver of eighteen years' experience, sat at the wheel of his eight-ton

International truck as it rolled southwardly along Route 11, a three-lane highway, on the way from West Nanticoke to Hunlock's Creek, both in Luzerne County, Pennsylvania. It was 8 o'clock in the morning, the weather clear and dry, the visibility good, when Hines, overtaking a nine-ton GMC truck, passed uneventfully around it and returned to his side of the highway. The GMC truck, (driven by Aldo S. Fanti), routinely followed in the wake of the Hines truck until both vehicles reached the bottom of a slow descent and then began a slight ascent. Suddenly the Hines truck veered to the right, travelled some 100 feet on the berm or "embankment" flanking the roadway, ran into a retaining wall, and climbed the barrier until momentum and gravity threw it back into a half somersault. It finally came to rest, overturned, partly in the southbound and partly in the center lane of the road, Hines crushed to death in the demolished cab.

G. Marie Hines, his widow, as administratrix of his estate, and on behalf of herself and three minor children, brought suit against Aldo S. Fanti, the operator, and Jerry Rubbico, the owner of the GMC truck, charging that Fanti, in seeking to pass Hines on the highway, struck the left rear portion of the Hines truck, forcing it off the highway and into the culminating disaster. At the ensuing trial, the jury returned a $25,000 verdict for the plaintiff and against both defendants, who have appealed for a judgment non obstante veredicto.

For convenience and clarity in narration and exposition the truck driven by Fanti will be referred to here as the Fanti truck, and the truck driven by the decedent will continue to be called the Hines truck.

The defendants contend that the Fanti truck did not touch the Hines truck prior to the accident and they advance the theory that the tragedy of Hines was the result of his losing control of his vehicle just before the

crash. A theory without factual data to support it has no more weight in a courtroom than in a scientific laboratory. There is no evidence that Hines, with an 18 year record of safe driving, was intoxicated, ill or distracted. He was 42 years of age, married and had a family of three children, factors which normally bespeak sober and serious attention to duty and work. And, of course, there is always the presumption in law that one who loses his life in an accident used due care. Aldo S. Fanti was 24 years of age and had had about 2 years' experience as a driver. He had driven over this particular route for only about *one week*.

The defendants contend further that since no one testified to the precise instant of the contact between the two trucks the accident was therefore unwitnessed and the plaintiff's case should fail for lack of evidence. In *Tucker v. Pittsburgh Rys.*, 227 Pa. 66, we said: "Accidents in which life is lost not infrequently occur unwitnessed. Such fact in itself does not operate to protect one whose negligence can be shown from the general situation and circumstances to have been the operative cause. When these are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the party charged, liability attaches."

Witness Michael Sunday testified that he was on the road the morning of the accident and saw the two trucks moving along at from 30 to 40 miles per hour and that the Hines truck, after it had overtaken the Fanti truck, preceded the Fanti truck. Witness Charles Piatt testified that he was travelling about 800 feet behind the two trucks and that just before the Hines vehicle burst into a cloud of dust he saw the Fanti truck in the middle lane, which was the passing lane. This could well have been the flash of a moment after the Fanti truck, in an abrupt movement to the left, had struck the Hines truck.

That Fanti was conscious of some clash was evident from the testimony of his employer Rubbico, who said that a few minutes after the accident Fanti declared to him that "he was sorry he smashed my truck."

Although it is true that there was no ocular evidence of the kiss of death between the two vehicles, the circumstances proved the nature of the fatal encounter as vividly as any human voice could describe. Immediately after the accident it was discovered that the Fanti truck bore collision marks at the very points where it would come into contact with the Hines truck in the attempt to pass it. Norman Phethean, who made an investigation of the accident and took pictures of the vehicles involved, testified that on the Fanti truck he found "a dent in the right front corner of the body structure and a scrape on the gas cap and a bend in the gas line."

"Q. And where was the gas cap and gas line to which you refer on this red truck? [Fanti truck] A. It is the rear of the cab, just ahead of the dump body. Q. On what side? A. On the right side. Q. And will you describe the dent which you found in the dump truck body? A. It is a rather sharp dent, approximately ten to twelve inches from the floor of the truck. Q. About how deep was the dent, if you recall? A. Well, the entire distortion was probably seven-eighths of an inch deep. Q. And what was the condition of the gas cap? A. The gas cap was rubbed, the surface rubbed. . . Q. Tell us what you saw on the gas cap and gas line? A. I saw a brush type of damage on the gas cap and an impact type of damage on the main body of the truck."

Samuel Houseman, another witness, testified that when Fanti's truck came to a stop, Fanti got out of his cab, walked around the front of the vehicle, and with his hand rubbed the dents and scarrings, in apparent confirmation of their existence. Later, in explanation of this gesture with its implication of conscious culpa-

bility, Fanti testified that he felt weak and put his hand against the truck for support. But it was not explained what particular support he could derive from a dent in the metal.

The Hines truck carried collision marks on the left rear corner, which is where it would have been hit by a passing vehicle marked and dented as was the Fanti truck. Phethean testified: "Q. Now, will you describe the damage, as you found it, at the left rear corner of the dump truck body of the green, or Pollock, truck [Hines] when you took the photographs? A. I found the left rear lower sill crushed in and rolled under. Q. And of what material was that truck body made at that point. A. Steel. Q. And did you find any force lines or stress lines at that point? A. Yes, there were stress lines from the break in the metal and also from the separation of a weld. . . Q. Mr. Phethean, will you tell us what became of the metal, or did you find any metal at the point indicated in the break? A. Well, the original metal was still there. However, it was distorted. Any time steel is rent, it has to go somewhere and, in this case, it went in and out as well; rather up."

An auto vehicle which ploughs into another, often leaves behind it identifying marks of aggression no less incriminating than the fingerprints on the dagger with which an assassin slays his victim. The Fanti truck was painted red. The Hines truck was painted green. The scarrings and distortions on the *Fanti* truck carried newly acquired *green* paint. The damaged area of the *Hines* truck at the left rear carried freshly acquired *red* paint.

The appellants admit that this criss-cross of paint was caused by contact between the two trucks but argue that the mutual scrapings occurred because the two vehicles came together *after* the Hines truck had overturned into the roadway. But this is another theory

which evaporates in the laboratory of logic and fact. When the Hines car fell prostrate to the highway after its plunge against the stone wall, it was turned around—with the front facing north and the rear facing south. It also lay diagonally with the cab partly in the center lane and the body practically entirely in the southbound lane. This made it physically impossible for the Fanti truck to transfer any of the red paint from its right side to the rear end of the Hines truck and vice versa pick up paint from the Hines truck at the described points on the left rear of that vehicle. And it is also to be noted that there was no red paint adhering to the front of the Hines truck which is where it would be, if the Fanti truck had engaged it in the manner suggested by defendants' counsel.

Moreover, not one of the witnesses called by the defendants testified to any contact between the Hines and Fanti trucks after the former's crash against the barrier. Dayton Hess, a defense witness, who was only 30 or 40 feet away from the rear end of the Hines truck following the crash, specifically declared that within his vision there was no contact between the Fanti truck and the Hines truck after it had capsized. Even Fanti did not specify to any contact with the Hines vehicle. He said that when he saw Hines leaving the road and travelling on the "embankment," he swung to his left and by the time Hines got to the retaining wall, Fanti had reached the northbound lane: "Q. So that you got over into the northbound lane before you got to the retaining wall? A. Yes. Q. And prior to that time, you were travelling in the center lane. A. Yes, sir."

In his able opinion refusing judgment n.o.v. and a new trial, the learned trial judge said: "Under this testimony Fanti's truck was already in the northbound lane before he reached that portion of the highway opposite the retaining wall. Therefore, it was impossible for

Fanti's truck in the northbound lane to have struck the Hines' truck in the middle or southbound lane after the accident."

Not only does this impossibility of post-accident juxtaposition rule out the defendant's theory of how the cuts and scars on both vehicles were incurred, but the metallic wounds themselves tell the irrefutable story that they were inflicted while both vehicles were moving forward. The piece of steel on the Hines truck known as the "rim" was torn *forward*. The photographs in evidence demonstrate conclusively that the metal bent under and *toward the front* of the truck. Had the Fanti truck collided with the Hines truck as it lay upside down on the highway, (the cab facing south) the metal would have torn in the direction of the *rear* of the truck, assuming that the pressure of the Fanti truck could have reached that part of the Hines vehicle.

Rubbico testified at the trial that he measured the dent on the right side of his truck and it was 61 inches above the ground surface. A plaintiff's witness was asked the distance from the lower sill of the Hines truck to the ground. He replied that "it was difficult to estimate," and then gave that *estimate* as 45 inches. On this discrepancy between a measured distance and an estimated distance, defendants' counsel argues in his brief that "the physical facts are incontrovertible and fully support the contention of the Appellants that the contact between the trucks occured after the Hines truck had struck the wall." No comparison is of any value unless the factors are constant on both sides. A comparison of weight between two objects cannot be reliable unless the scales which produced the figures are mechanically and functionally identical. The measurement of 61 inches on the Fanti truck was made one year after the accident while the truck was empty, although at the time of the accident it was heavily loaded; there was no

evidence as to the air pressure in the tires of either truck at the time of the accident; the measurement on the Fanti truck was made while the truck was stationary although when the accident occurred it was moving at from 30 to 40 miles per hour. All these variables argue against reliability in comparison. And then, the roadway at the point of accident was not evenly surfaced; thus it was quite possible that at the very moment of impact, one or more of the Fanti wheels hit a higher elevation than that being traversed by the Hines truck.

In *Mull v. Bothwell*, 338 Pa. 233, the defendant contended that the plaintiff could not have been injured as she stated, because the height of the auto door handle which struck her was 43 inches above the cartway while the height of the injury on her arm, above the cartway, considering the elevation of the curb on which she stood, was 53 inches. In affirming the judgment obtained in the lower court, this Court said: "The alleged mathematical impossibility of the injuries being inflicted as plaintiff contends they were, if she remained standing on the sidewalk, is the proposition most strongly pressed by defendant. It was shown that the door handle was 43 inches above the cartway, and that the height of the curb, plus the height of the injury on plaintiff's arm above the surface on which she was standing, was 53 inches and it is argued that it is impossible for the door handle "to have leaped" this intervening space of 10 inches between the height of the door handle and the point of injury to her arm. This calculation assumes that plaintiff was standing erect. She may not have been, she was looking to the right possibly relaxed, not at full height, her left arm, the one struck, toward the car. The car may have bounced on its springs. Her inerectness and its bounce could have obliterated this seeming distance. There is no mathematical certainty in this proposition. *The incontrovertible physical fact*

262

*rule does not apply where there are possible variables and where moving objects are concerned*: Schaeffer v. Reading Transit Co., 302 Pa. 220, 153 A. 232; Reiser v. Smith, 332 Pa. 389, 2 A. 2d 753." (Italics supplied)

Art. X, §1010 of The Vehicle Code of 1929, P. L. 905, as amended, 75 PS 545, reads: "(a) The operator of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the speed of such vehicle and the traffic upon and condition of the highway." Fanti testified that he followed the Hines truck at a distance of from 15 to 20 feet behind him. Whether this constituted negligence under the circumstances was a question for the jury to decide.

Art. X, §1007 of The Vehicle Code, supra, declares: "The driver of any vehicle overtaking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof. . ." Whether Fanti attempted to pass at a safe distance was a question, under all the circumstances, for the jury to determine.

The printed record in this case, which runs to 435 pages, shows that counsel for the defendants, as well as counsel for the plaintiff, conducted themselves at the trial with laudable ability, resourcefulness and energy. The arbiter of the facts was the jury, and we are satisfied from the record that the verdict is supported by the credible evidence presented by both sides.

Judgment affirmed.